Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8475 | **DATE** | 8/27/2001 |
| **CASE TITLE** | THOMAS A. DUNCAN, JR. vs. PARALYZED VETERANS OF AMERICA | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment is granted.

(11) ☒ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | AUG 2 8 2001 | |
| | Notified counsel by telephone. | | date docketed | 19 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | FILED FOR DOCKETING | | |
| | Copy to judge/magistrate judge. | 01 AUG 28 AM 9:01 | date mailed notice | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

AUG 28 2001

THOMAS A. DUNCAN, JR., )
)
Plaintiff, )
) No. 99 C 8475
v. )
)
PARALYZED VETERANS OF AMERICA, ) Judge John W. Darrah
VAUGHAN CHARTER, an Illinois Non-Profit )
Organization, ) AUG 28 2001
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Thomas A. Duncan, Jr. (Duncan), commenced an action against defendant, the Paralyzed Veterans of America, Vaughan Chapter (PVA)[1], alleging that the defendant terminated his employment in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* Before this Court is PVA's Motion for Summary Judgment under Federal Rule of Civil Procedure 56(c).

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). All the evidence and the reasonable inferences that may be drawn from the evidence is viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). However, the nonmovant must still

---

[1] Defendant, the National Organization of the Paralyzed Veterans of America, was dismissed upon an agreed stipulation of dismissal in December 2000.

come forward with evidence establishing the elements of his claim on which he bears the burden of proof at trial. *Miller*, 203 F.3d at 1003.

In the instant case, Duncan failed to file a response to PVA's Motion for Summary Judgment. Therefore, all the material facts averred by PVA are deemed admitted because Duncan failed to controvert such facts. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1167 (7th Cir. 1997); L.R. 56.1(b)(3)(B). Although Duncan failed to respond to PVA's Motion for Summary Judgment, the motion will only be granted if it demonstrates that there is no genuine issue of material fact, and PVA is entitled to judgment as a matter of law. *See Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994).

The Vaughan Chapter of the PVA hired Duncan, an African American, as the Chapter Services Director in 1976. (Def.'s Statement of Facts ¶¶ 1-2). From 1997 until 1980, Duncan held the position of Deputy National Service Director with the National PVA. (Id., at ¶ 2). In 1980, Duncan ran and was elected to the position of President of the Vaughan Chapter. Duncan was President of the chapter until 1984. (Id., at ¶ 3). In 1985, Duncan was appointed to the position of Executive Director of the Vaughan Chapter. Duncan held this position until his termination in September 1998. (Id., at ¶¶ 4-5).

From 1976 until 1991 Duncan was a full-time employee on a non-contractual basis. (Def.'s 56.1(a)(3) Statement ¶ 6). From 1991, until his termination, Duncan was employed on a contractual basis. At the time of his termination, Duncan and the Vaughan Chapter were under an employment contract executed in 1996. (Id., at ¶ 7).

At all times during Duncan's tenure at the Vaughan Chapter, the Vaughan Chapter had a Board of Directors (the Board) that consisted of seven to nine members. The Board members

included the positions of President, Vice president, Secretary, Treasurer, and Executive Director. (Def.'s 56.1(a)(3) Statement ¶ 12).

Duncan met James Derrico (Derrico), a white male, in 1981. (Def.'s 56.1(a)(3) Statement ¶ 8). In 1985, Derrico was elected as the Secretary of the Vaughan Chapter. Derrico served as Secretary until 1990. (Id., at ¶ 9). In 1988 or 1989, Duncan and Derrico began to develop a good working relationship. (Id., at ¶14). In 1990, Derrico was elected as the Vice President of the Vaughan Chapter. As Vice President, Derrico reported to Duncan. Derrico held the position of Vice President until 1996. (Id., at ¶ 10). While Derrico was Vice President, he and Duncan had a good working relationship. (Id., at ¶ 16). In 1996, Derrico was elected President of the Vaughan Chapter. (Id., at ¶ 17).

In 1991, Duncan was offered the position of Associate Executive Director for Administration with the National PVA. Duncan declined to accept the position with the National PVA after the Vaughan Chapter agreed to provide him with a contract that would require the Board to yearly re-appoint him (or not re-appoint him) to the position of Executive Director prior to the yearly election results so that he would not be required to vote for the officers who were seeking re-election. (Def.'s 56.1(a)(3) Statement ¶ 15).

From 1996 until his termination, Duncan and Derrico did not have a good working relationship. (Def.'s 56.1(a)(3) Statement ¶ 18). As a result, Jim Peters (Peters), of the National PVA, required Duncan and Derrico to participate in twice monthly telephone conferences. (Id., at ¶ 19). In approximately August 1997, Duncan heard that the Board was trying to "get rid of him." (Id., at ¶ 21).

In the fall of 1997, Duncan and Derrico argued about the role of the Vaughan Chapter's

Auxiliary Organization (Auxiliary). (Def.'s 56.1(a)(3) Statement ¶ 22). Duncan and Derrico also were "at odds" over the fact that Duncan believed that Derrico should have spent more time with him and other members of the Vaughan Chapter delegation at the PVA's national meeting of 1997. (Id., at ¶ 23).

In 1998, the Vaughan Chapter bid and obtained the right to host the bass tournament (event), a national event, in Springfield, Illinois. The event had never been hosted by the Vaughan Chapter or previously held in Illinois. The event was to take place from July 24 through July 26, 1998. (Def.'s 56.1(a)(3) Statement ¶ 25). As Executive Director, Duncan was responsible for preparing and putting together the event. As President, Derrico was in charge of overseeing the preparation and putting together of the event. (Id., at ¶ 26). Duncan claimed that Derrico held "clandestine" meetings prior to the event regarding such issues as prizes and "the color of t-shirts and so forth and so on." (Id., at ¶ 27).

At the event, issues arose between Duncan, Derrico, and Derrico's wife and between Derrico, Derrico's wife, and various Vaughan Chapter volunteers that Duncan had arranged to help with the event. (Def.'s 56.1(a)(3) Statement ¶ 28). For example, when Duncan arrived at the event, he learned that Derrico and another individual associated with the Vaughan Chapter, Tom Mansfield (Mansfield), had upset Diane Brown (Brown), a Vaughan Chapter employee and volunteer at the event. (Id., at ¶ 30). In addition, Derrico's wife repeatedly changed the work assignments of the volunteers who were at the event. Duncan believed that it was his responsibility, and not Derrico's responsibility, to instruct and direct the volunteers and that Duncan believed that Derrico was "usurping" his position as Executive Director and "trying to pull a power play." (Id., at ¶ 30).

On the last day of the event, Duncan and Derrico got into a shouting match that was initiated

4

by Duncan, regarding the manner in which Derrico had acted at the event toward volunteers and the manner in which Derrico attempted to usurp Duncan's authority. (Def.'s 56.1(a)(3) Statement ¶ 31). Duncan did not make a complaint to the Vaughan Chapter's Board following the event. (Id., at ¶ 32).

A couple days after the event, two members of Duncan's staff who were volunteers at the event informed Duncan that they did not like the way they were treated and wanted to take the matter to the Board. (Def.'s 56.1(a)(3) Statement ¶ 33). Duncan contacted Peters of the National PVA who informed Duncan that his staff members had to file their complaints in writing to Duncan. (Id., at ¶ 34). Duncan informed his staff to put their complaints in writing and give the complaints to Duncan. Duncan would then present the complaints to the Board of Directors. (Id., at ¶ 35). Duncan also contacted a Vaughan Chapter attorney and informed him that there were some "charges coming down, complaints from the staff and about the president." (Id., at ¶ 36).

Prior to the Vaughan Chapter's next regularly scheduled Board meeting of August 4, 1998, Duncan obtained statements from his staff about the event, prepared his own statement about the bass tournament, and submitted those materials to the Board members in advance of the Board meeting scheduled for that same day. (Def.'s 56.1(a)(3) Statement ¶ 37). Statements or complaints were submitted by or for four volunteers of the event: Alicia Revalee (Revalee), Ed Smith (Smith), Kevin Fitts (Fitts), and Brown. (Id., at ¶ 38). None of the individuals who submitted statements, nor Duncan's cover letter, claimed that they had been discriminated against or harassed because of their race or some other protected class. (Id., at ¶ 39).

At his deposition, Fitts testified that he did not prepare the statement that was submitted under his name; he did not sign that statement; he did not know that it had been prepared; and he had

5

not seen that statement until several weeks prior to his deposition in this action. (Def.'s 56.1(a)(3) Statement ¶ 38). Fitts also testified that the statement related to an argument that he had with Derrico's wife, and later with Derrico, with regard to the t-shirts that Fitts and other volunteers were passing out to participants at the event. Fitts did not know Derrico's identity at the time Derrico approached Fitts at the event, and he had no basis for believing that Derrico had anything against African-Americans. (Id., at ¶ 41).

Smith testified at his deposition that the subject of his statement was his observations of the argument that took place between Fitts and Derrico's wife. Smith believed that Derrico's wife's conduct was "inappropriate" and "overbearing" and that she was discriminating against Fitts based upon the fact that Fitts was a volunteer and not a full-time employee. Smith had no basis to believe, either before or after the event, that Derrico was someone who discriminated against African-Americans. (Def.'s 56.1(a)(3) Statement ¶ 42).

Brown testified at her deposition that the subject of her statement related to her interactions with Derrico, Derrico's wife, and Mansfield regarding gift certificates that were to be given away as prizes at the event. Another basis of her complaint related to an argument she had with Derrico regarding t-shirts. (Def.'s 56.1(a)(3) Statement ¶ 43). Brown never heard Derrico make any statements that she believed reflected Derrico had any racial animus or hostility toward African-Americans and that she had no basis for believing that Derrico was prejudiced against African-Americans. (Id., at 44). Brown had worked for the Vaughan Chapter for several years and knew of a long-running personality conflict between Derrico and Duncan and between Derrico's wife and Duncan. (Id., at ¶ 45).

Revalee testified at her deposition that she observed the arguments relating to the t-shirts and

6

observed Duncan and Derrico's "shouting match". Revalee's intention in preparing her statement was to address the fact that she and other volunteers were not "appreciated" and that Derrico and others were "rude" to the event volunteers. Revalee was aware of a personality conflict and arguments between Duncan and Derrico prior to the event. (Id., at ¶ 46).

At the August 4, 1998, Vaughan Chapter Board meeting, the following individuals were present: an attorney for the Vaughan Chapter and Vaughan Chapter Board members, Duncan, Derrico, Robert White, Frank Reuth, Mitchell Pate, Jerry Lewandowski, Ben Lerma, Eddie Turner, and Paul Kolb. (Def.'s 56.1(a)(3) Statement ¶ 47). The Board voted unanimously to appoint a committee and hold a disciplinary hearing on August 14, 1998, to consider the substance of the complaint. (Id., at ¶ 50). Also at that same meeting, Duncan raised the issue of his contract. In response, the Board voted to have Derrico review the status of Duncan's contract. (Id., at ¶ 51).

On August 10, 1998, Derrico sent Duncan a fax stating that he was in the process of renegotiating Duncan's contract and that it was necessary for Duncan and Derrico to meet in person to discuss each section of the contract. He submitted possible dates to meet of August 25, 26, or 27, 1998. Derrico requested that Duncan contact him to confirm a date for the meeting. (Def.'s 56.1(a)(3) Statement ¶ 52). In response to the facsimile, Duncan and Derrico agreed to meet on one of the suggested days. On August 18, 1998, Derrico told Duncan that he was not going to recommend that the Board renew Duncan's contract based upon the manner in which Duncan had treated Derrico during the past year. Derrico believed and charged that Duncan and his staff of volunteers had been insubordinate. (Id., at ¶ 53). Duncan did not attempt to further speak to Derrico about the renewal of his contract because he believed it was a "Board issue". He also believed that, pursuant to the terms of his contract, he would remain employed as the Executive

7

Director until September 30, 1998. (Id., at ¶ 54).

On August 14, 1998, the committee that the Vaughan Chapter appointed to review the complaints against Derrico met for approximately two or three hours. Duncan was a member of the committee. The committee members called as witnesses the individuals who had submitted statements as part of their complaint and elicited their stories from them as described above. (Def.'s 56.1(a)(3) Statement ¶ 55). At the conclusion of the meeting, the committee voted unanimously to continue the investigation of the complaints against Derrico and to consider those complaints in a formal Board session for the purpose of deciding what disciplinary action, if any, the Board should take against Derrico. (Id., at ¶ 57). Duncan testified at his deposition that the committee conducted an appropriate and thorough investigation at the August 14th hearing and that the committee did everything that it needed to do to properly investigate the complaints against Derrico. (Id., at ¶ 56).

On August 28, 1998, the committee sent Derrico a letter informing him that he was being charged with eight categories of infractions based upon the information gathered at the August 14, 1998 disciplinary hearing. Each of the charged infractions related soley to Derrico's actions, or inaction, at the July 1998 event. The letter further informed Derrico that the charges would be considered by the entire Board at its regularly scheduled meeting on September 8, 1998, and that Derrico would have the opportunity to answer those charges at that time. (Def.'s 56.1(a)(3) Statement ¶ 59).

The September 8, 1998, Board meeting did not take place because Kenneth Huber (Huber), the President of the National PVA, sent a letter to the Vaughan Chapter stating that it must cease and desist with its proceedings against Derrico until the National PVA concluded its own investigation into a complaint made by Derrico to the National PVA that, at the Vaughan Chapter's August 4,

8

1998 meeting, his powers as President of the Vaughan Chapter were improperly usurped and that he had been, in essence, removed from office at the meeting. The letter also stated that if the Vaughan Chapter Board did not cease and desist in its proceedings, Huber would recommend to the National PVA that it suspend its yearly chapter contribution of approximately $100,000. (Def.'s 56.1(a)(3) Statement ¶ 60). In response to Huber's letter, the Vaughan Chapter Board agreed to wait to conclude its consideration of the charges against Derrico. (Id., at ¶ 61).

Nevertheless, the September 8, 1998, Board meeting was held, but the charges against Derrico were not addressed. (Def.'s 56.1(a)(3) Statement ¶ 62). At that meeting, Robert White, a Board member, made a motion not to re-hire Duncan as the Executive Director. The motion was seconded by Board member Ben Lerma. A vote was taken on the motion, and the motion did not pass. Duncan testified at his deposition that he believed that Derrico abstained from voting on the motion.

On or about September 22, 1998, Duncan and Derrico met to dicuss Duncan's contract. During that meeting, Derrico inquired of Duncan as to whether the two of them were "going to be able to work togther in the coming year." (Def.'s 56.1(a)(3) Statement ¶ 65). Duncan responded, "As long as it was for the good of the Chapter, yes." (Id., at ¶ 66). When Duncan left the meeting, he believed that his contract was going to be renewed and extended beyond September 30, 1998. (Id., at ¶ 65).

On September 29, 1998, the Vaughan Chapter Board held a regularly scheduled meeting. The status of Duncan's contract was one of the agenda items for the meeting. (Def.'s 56.1(a)(3) Statement ¶ 66). At the meeting, Derrico told the Board that he would not recommend that Duncan's contract be renewed, and he provided the Board with several performance-based complaints as bases

9

for his opposition to Duncan continuing as Executive Director. Derrico further cited Duncan's insubordination as an additional basis for his opposition to Duncan's contract renewal. (Id., at ¶ 67). A motion to renew Duncan's contract did not receive affirmative votes by two-thirds of the Board members and, therefore, was defeated. The motion received five "yes's" and three "no's" – with Duncan's vote not being considered because we was the subject of the vote. (Id., at ¶ 68).

Subsequently, the Board voted unanimously to fill Duncan's Executive Director position with Brown, an African-American. (Def.'s 56.1(a)(3) Statement ¶ 71). In addition, the Vaughan Chapter concluded its investigation into Derrico's conduct and took disciplinary action against Derrico. (Id., at ¶ 72).

To establish a *prima facie* case of retaliation, the plaintiff must show that he : (1) opposed an unlawful employment practice covered by Title VII, (2) was the object of an adverse employment action, and (3) that the adverse employment action was caused by his opposition to the unlawful employment practice. *Hamner v. St. Vincent Hosp. & Health Care Center, Inc.*, 224 F.3d 701, 705 (7th Cir. 2000) (*Hamner*).

In the first element, a plaintiff must come forward with sufficient admissible evidence to demonstrate that the subject of the "complaint" involves discrimination that is prohibited by Title VII. *Hamner*, 224 F.3d at 706-07. Title VII prohibits discrimination because of an individual's race. 42 U.S.C.§ 2000e-2(a)(1).

In the instant case, plaintiff alleges that he was retaliated against after complaining about Derrico's racist conduct. The undisputed facts show that the complaints about Derrico by both Duncan and other individuals that were put before the Board pertained to Derrico's treatment of individuals at the event -- *i.e.*, Derrico and his wife were mean, unprofessional, and verbally abusive,

and Duncan's belief that Derrico tried to "usurp" Duncan's authority. None of the complaints indicate that any of Derrico's alleged mistreatment of individuals were based on race. The individuals that filed complaints testified at their depositions that they had no reason to believe that race was a factor in the treatment they received.

In addition, none of the complaints before the Board were written by Duncan, and he concedes that he did not make a complaint to the Board following the event. Instead, Duncan submitted the complaints of others, as discussed above.

Based on the above undisputed facts, Duncan has failed to show that the subject of his complaint involved race discrimination or any other prohibited type of discrimination found in Title VII. All of the complaints, Duncan's cover letter, and the testimony by Duncan and the complainants indicate that the complainants believed that they were mistreated at the event, but such mistreatment was not based on race. Accordingly, Duncan has failed to establish a required element of his claim.

Assuming argumendo, that the complaints could be construed as "protected expression", summary judgment is still proper because Duncan has failed to establish the third element of a *prima facie* case of retaliation.

A plaintiff demonstrates a causal link between his or her opposition to unlawful discrimination and the adverse employment action by showing that the adverse action would not have occurred "but for" the protected expression. *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1146 (7th Cir. 1997). Therefore, Duncan must demonstrate that the Board's decision not to terminate his contract was linked to his prior assertion of his protected rights.

In the present case, Duncan and Derrico had a strained relationship dating back to 1997, and

11

Duncan believed that Derrico was attempting to terminate his employment with the Vaughan Chapter as far back as August 1997. The strained relationship existed prior to the problems that occurred at the event and the subsequent complaints that stemmed from the event.

In addition, the Board expressly stated that it would not take any retaliatory action against anyone who filed a complaint or participated in the complaint process. Based on the complaints, the Board initiated a special disciplinary committee to fully consider the allegations against Derrico. Duncan concedes that the committee conducted an appropriate and thorough investigation. Derrico was subsequently disciplined for his actions at the event.

Furthermore, the decision not to renew Duncan's contract was approved by a two-thirds vote of the Board members, and Duncan failed to provide any evidence demonstrating, or allowing an inference to be drawn, that the Board members voted not to renew his contract because of the complaints filed against Derrico.

Based on the above undisputed facts, Duncan has failed to demonstrate that his contract would have been renewed but for the complaints against Derrico.

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

Dated: Aug. 27, 2001

JOHN W. DARRAH
United States District Judge